THE PEOPLE, *ex rel.* WILLIAMS, *v.* KINGMAN *et al.*

Ground adjoining a saw-mill and used for piling logs, but whose limits are not fixed by fences or other visible marks, nor by definite occupation, is not within the statute (1 R. S., p. 514, § 57) prohibiting the laying out of public roads through mill-yards.

It is the duty of the commissioners, in laying a highway over such ground, to leave a sufficient area for the use of the mill-owner, and their discretion as to the quantum is not reviewable in any other proceeding.

The ditch or canal by which the water is conducted to a mill is not a building, fixture or erection within the meaning of the statute. A

highway may be laid along it, comprehending it in whole or in part within the limits of the road; but if necessary to work the road to its entire width, it must be by so constructing a roadway over the channel as not to obstruct the flow of water.

It is not essential to a highway, at common law or under our statute, that it be a thoroughfare. A road may be laid out by the public authority which has no issue at one extremity, and abuts upon private ground.

ERROR to the Supreme Court to review a judgment awarding a peremptory mandamus to the commissioners of highways of the town of Cincinnatus, in Cortland county, requiring them to assess the damages occasioned by the laying out of a certain highway in that town, and to open the highway by removing the fences and marking the same.

The highway had been laid out by referees under the act of 1847 (ch. 455), after a refusal by the commissioners to lay it out, and after an appeal from their decision, and a reversal of that decision by such referees. No question arose respecting the regularity of these proceedings, if the referees had jurisdiction; and their jurisdiction was questioned only upon the ground that the road, as laid out, ran through the yard of a saw-mill, which was alleged to be necessary to the use and enjoyment of the mill; and on the further ground that, for a part of its course, it ran upon a canal or artificial channel used to conduct water to the mill-wheel. But it was also urged on the argument here, that the southern terminus of the road did not connect with any other public road, and therefore it was not, as it was claimed, a legal highway. The fact of such a want of connection was set up in the return, and was not denied. An issue, involving the question first mentioned, was made up by a plea in bar to the return to the alternative writ, and a replication put in by the relator. The evidence at the trial related principally to the mill-yard of Warner Harrington. This person was the owner of a saw-mill situated on the westerly side of the Otselic river, which here runs in a southerly direction. The supply of water to drive the wheel is not furnished by the river, but is brought in a canal or ditch from another stream, which canal runs to the mill at the river, form-

ing an acute angle with it at the northerly or upper side. On the southerly side of the ditch, and the westerly side of the river, the ground appears to have been open and uninclosed, and a portion of it had been used for piling logs brought to the mill to be sawed. The highway, as laid out, runs through this ground in such a manner as to leave a triangular piece of land, containing sixty square rods, between it and the river and the ditch. Much of the evidence was addressed to the question whether this piece of land was of sufficient dimensions for a yard for piling saw-logs for this mill; some of the evidence showing that some saw-logs had formerly been deposited beyond it and on the ground occupied by the track of the highway. Two of the three referees who laid out the road were examined, and testified that they, on that occasion, examined witnesses on oath as to the sufficiency of the ground for a mill-yard, and came to the conclusion that enough space would be left after the road should be opened. The judge decided, in effect, that the road was not laid out in violation of the statute in this respect, and that the decision of the referees as to the quantity of land which was necessary as a yard for the use and enjoyment of the saw-mill was conclusive, and could not be controverted in this action.

It appeared that the highway, as laid out, crosses the canal or ditch, and that, for the distance of eighteen rods, before so crossing, it runs along the ditch in such a way as to include such ditch in the width of three rods allotted to the highway, the centre line of the road being on the northerly line of the ditch, which, at that place, is about one rod wide at the top, the depth of the water being two or three feet. The judge held that there was not an excess of jurisdiction on the part of the referees. And, finally, he directed a verdict for the plaintiff on the several issues, which was accordingly rendered. The defendants' counsel excepted to the several rulings above mentioned.

Judgment was given for a peremptory mandamus, directing the defendants, as commissioners, to proceed to open the road, &c.

*John H. Reynolds*, for the plaintiff in error.

*Mr. Seymour*, for the defendants in error.

DENIO, J. This case depends mainly upon the application to the facts proved of the provision of the Revised Statutes which declares that no public road "shall be laid out through any buildings, or any fixtures or erections for the purpose of trade or manufactures, or any yards or inclosures necessary to the use or enjoyment thereof, without the consent of the owner." (1 R. S., p. 514, § 57.) It is claimed that the highway in controversy was laid through a yard appertaining to the saw-mill of Mr. Harrington, and that such yard was necessary to the enjoyment of the mill. The evidence does not disclose that there was any piece of ground distinctly defined by fences or otherwise, and used as a mill-yard; but it appeared that there was unoccupied land adjacent to the mill, and belonging to the owner of the mill, upon a portion of which logs drawn there to be sawn had often been left. The mill-yard of a saw-mill I understand to be a place appropriated for the deposit of logs to be sawn, and for the piling of lumber which has been manufactured from such logs. I do not suppose that it is necessary that it should be inclosed by fences, in order to be protected by the statute; but we can form no clear notion of a yard whose boundaries are not defined in any way, either by an inclosure, by visible marks, or by a definite occupation within certain exterior lines. If a mill be situated in, or adjacent to a field of much larger extent than would be necessary for the mill-yard, no one would pretend that every part of it would be wholly shielded from the action of the authorities intrusted with the laying out of highways. Nor would every portion of the space upon which logs or lumber had at any time been piled be thus privileged. The facts proved on this trial presented a case for the judgment of some officer or tribunal as to the area which ought to be left undisturbed for the use of the proprietor of the mill, in the bestowal of the logs which might be brought to it and the lumber which should be sawn from them. Although no definite parcel of

The People *v*. Kingman.

ground should have been set apart for these purposes, the public could not, in my opinion, legally run a road in such a manner as to cut off all accommodation of that kind for the use of the mill. The counsel for the plaintiff in error maintains, in effect, that it is a question for the jury, in any collateral action in which the question may arise, whether the just rights of the owner in this particular have been infringed or not; while, on the other side, it is claimed, and the judge has decided, that the referees, whose duty it was to lay out the road, had the exclusive right to determine the question, and that their decision cannot be reviewed in any other proceeding. I am of this latter opinion. There was not here any mill-yard, properly so called, or within the sense of this statute. The proprietor of the mill was also the owner of the land about it, and, before the road was laid, he used such parts of it for the stowage of logs as he thought fit, and this he had a perfect right to do. When the officers authorized to lay out roads came there, they found a mill, but not a mill-yard. They were required, I think, by the spirit of the statute, so to lay the road, if they elected to lay out one on that route, as to leave land enough, between the road and the mill, out of which the owner could form a mill-yard. The extent of the area to be thus left was not a question affecting their jurisdiction, but it was a matter which the law had committed to their official discretion. It is possible that a clear abuse of their authority might subject them to an action on the case at the suit of the party injured; but, so far as the public is concerned, the highway thus laid out was a legal highway, and it was the duty of the commissioners to proceed to open it.

It was not necessary for the referees to state, in the order made by them, that they had considered and adjudged that sufficient space had been left between the highway and the river and canal to form a mill-yard. Everything necessary to be determined by them was embraced in the conclusion mentioned in the paper signed by them, in which they set forth the reversal of the decision of the commissioners, and gave the location of the road as laid out by them.

Upon the other point, also, I think the judgment of the Supreme Court was right. The channel by which the water was conducted from the creek to the saw-mill was not a building or fixture, within any natural or fair meaning of these terms. Neither was it an erection, within the sense of the statute. That term implies some structure superimposed upon the land; and, under this act, it means something which a highway may be laid through, and which would be rendered useless by that act. The clause was probably introduced in consequence of the decision in *Clark* v. *Phelps* (4 Cow., 190), where it was held that a highway could not be laid out through a range of tenter-bars belonging to a fulling-mill, or through a corn-crib, or the yard of a saw-mill or a fulling-mill. It was a singularly free interpretation of the then existing statute, which did not contain the inhibition which was subsequently inserted, and which we are now considering. That provision was, no doubt introduced into the Revised Statutes to establish on a more firm foundation and to define a wise rule upon that subject; and it should be construed, like other statutes, by the terms made use of. The language is limited to structures of the nature of those involved in the case referred to; and there is nothing in it which can well be applied to a water-course, natural or artificial. Highways are never laid through streams of water; but it is, of course, quite common to pass over them by bridges. Where the highway in question crosses the canal, it must run over it by means of a bridge. It would be an abuse of terms to say that it was to run through it. So where it runs along the channel, embracing it in its width, it is not to be understood that the water-course is to be filled up. If it were certain that the road could not be otherwise opened than by destroying the channel, and thus shutting off the water from the mill of Mr. Harrington, I should be inclined to hold that the case would be within the equity, though it is not within the exact language, of the act; for it could not be admitted, without great absurdity, that, while the law protects the mill itself as a building, and the yard as a necessary appendage, it should be allowed to the

officers to render them both valueless by so laying out the road as to destroy the supply of water by which the mill was driven. If it is necessary to work the road in its whole width, it must be done by constructing a roadway over the channel in such a manner as not to interrupt the flow of water to the mill.

The remaining question is, whether the highway in question is illegal, and the proceedings to lay it out void, for the reason that it does not connect with any other public highway or navigable water at one of its extremities. This point was not made at the trial; and if the case came here on appeal, it could not be considered. But the fact relied on is admitted by the pleadings; and, being thus upon the record, must be disposed of before judgment can be given. It is, moreover, a question of considerable practical importance; and, if it be doubtful, should be put at rest. It arose, for the first time in this State, in the present Supreme Court, in *Wiggins* v. *Tallmadge* (11 Barb., 457, anno 1851). It was an action brought to recover a penalty for an alleged obstruction of a highway. The road had been thrown open by private proprietors, and used by the public for a considerable time; and then the commissioners of highways ascertained, described and entered it of record, pursuant to the highway act. It connected at one end with a highway, duly laid out; but there was no means of egress at the other end. It was held by the court, Judge HAND giving the opinion, that it was a legal highway. The English cases are attentively examined, after the manner of that learned person, and he came to the conclusion that a *cul de sac* may be a good highway if laid out by the proper authorities. Judge CADY dissented. The same question, among others, was involved in *Holdane* v. *The Trustees of Coldspring*, reported in the Supreme Court (23 Barb., 103). The road, which was attempted to be established by proof of dedication by the owners of the land and acceptance by the public authorities, came to an end at one terminus upon the private grounds of an individual; while, at the other, it connected with a public street in the village of Coldspring. It was held not to be a

legal highway; two of the three judges of the Supreme Court putting the decision on the ground that a highway must be a thoroughfare, which the one in question confessedly was not. The remaining judge concurred in the conclusion, but placed his opinion upon the ground that it was not shown that the dedication was accepted on the part of the public; and that it was, therefore, incomplete. On appeal here, the judgment of affirmance which was rendered was placed upon the ground that no complete and irrevocable dedication was shown, and no particular examination was made of the ground upon which the judgment of the Supreme Court was based.

All the judges who have examined the point have considered it purely a common-law question, and have based their views upon the statements of English writers and judges. The opinion of Judge EMOTT, as a referee, in the case of *Holdane* v. *The Trustees of Coldspring*, which he adhered to on the decision of the case at the general term of the Supreme Court, and which, though not published in the report by Mr. Barbour, may be found attached to the printed case, contains a careful reference to all the principal English authorities except the late one, presently to be noticed. This opinion, together with that prepared by Judge HAND in *Wiggins* v. *Tallmadge*, will sufficiently show the state of the question in the English courts, so far as their decisions were known here at the time these cases were adjudged. It could not be considered as very clearly settled either way, when so wide a difference of opinion respecting it could prevail among learned judges.

The case of *Bateman* v. *Black* came before the Court of Queen's Bench in 1852. It was trespass, for entering the plaintiff's close and pulling down a wall there. The defendant pleaded that the *locus in quo* was a public and common highway for all the Queen's subjects, to go, return, &c. Replication, traversing the existence of the highway. There were other issues not material to be stated. At the trial, before Lord CAMPBELL, Ch. J., it appeared that the *locus in quo* was a passage, leading from the public street up to a

court, of which the plaintiff was the owner, and which consisted of fourteen or fifteen houses; but there was no thoroughfare through the court. The defendant had a house abutting on the passage, into which a doorway had been opened by him. The plaintiff required the defendant to block up this door, which he refused to do; and consequently the plaintiff directed a wall to be built in the court, so as to block up the defendant's doorway. This wall the defendant knocked down while it was being erected, which was the trespass complained of. The passage had been paved and lighted by the local authorities. Lord CAMPBELL directed a verdict for the defendant on the issue which has been mentioned, with leave for the plaintiff to move. On showing cause, the plaintiff's counsel admitted that the point, that this could not be a highway because there was no thoroughfare, had never been decided; but he referred to various dicta of judges on that side of the question. On the other side, it was urged that it was a mere *cul de sac*, and no thoroughfare; and that, hence, it could not be a highway. Besides the principal point, a question of dedication was discussed. Lord CAMPBELL announced his opinion as follows: "We must take it that there is a good finding on this issue, unless there cannot, in point of law, be a good highway where there is no thoroughfare. Now such a position cannot, I think, be supported. There may be, or there may not be, a highway under such circumstances. It would be very strong to hold that there could be no highway, even where there has been an express dedication to a public purpose, because the place is no thoroughfare. There may be a large square with only one entrance to it; and if the owner allows the public to use it without restriction for a great many years, he cannot afterwards turn round and say they were all trespassers. That would be, as said by Lord KENYON, a trap to catch trespassers. In *The Trustees of Rugby Chantry* v. *Merryweather* (11 East., 375, n.), Lord KENYON laid it down that there might be a public highway where there was a *cul de sac;* and that it was a question for a jury, on the evidence, whether such a place was a highway or

not. I do not find that this case has ever been expressly overruled. In the other cases referred to, the judges do not hold that such a highway does not exist, but only say that there is no evidence of there being a highway. It seems to me that it rests on the principle of convenience, that there may be a highway without a thoroughfare; and it is not inconsistent with what is laid down by Hawkins and other text-writers on the subject. The jury having here found that there was a highway, the fourth plea [which set up the existence of the highway], is made out, and, being unobjectionable in point of law, the defendant is entitled to judgment upon it." The three other judges, COLERIDGE, EARLE and CROMPTON, expressed similar views. The latter added: "It is always a strong objection to a jury that the way leads nowhere; still, if they are satisfied that it is a highway in point of fact, I know of no objection to their saying so." (14 Eng. Law and Eq., 69.) As I have mentioned, there was a question of dedication in the case; but here the highway has been established by public authority, if it be possible that a highway should exist in a case where there is no mode of egress at one extremity. After this well considered case, I take it no question can now be entertained upon the point at Westminster Hall.

If we were now free to lay down a rule upon the subject, as perhaps we are, the modern English cases not being authorities with us, I should say that the principle which has been thus established in England would be the more convenient and reasonable one. Highways and streets having no issue at one extremity are quite common, and indeed indispensable, in many parts of the country. Take the case of roads leading into the northern wilderness of this State. They extend as far as the country is settled, where they stop, and remain in that condition until the progress of the settlements warrants their further extension. If it were held that they could not be laid out unless they should run quite across the mountains to the northern slope, it would be impossible that they should ever be established. The same remark is true of roads laid

The People *v.* Kingman.

out in the newly-settled portions of the State bordering upon the original forests. The roads are projected into the wilderness as far as it is necessary or practicable at the time to make them; and afterwards they are extended from time to time, as circumstances may require. For similar reasons, in many of the cities and villages there are short streets leading to ravines and to cliffs, whence there can be no outlet, and where they must necessarily stop; and yet the owners of dwellings, situate upon these passages, find them quite indispensable to the enjoyment of their property; and they would be greatly surprised to be told that they were not legal streets. The same thing is true of streets running to unnavigable waters, or to points on the sea-shore, where there cannot be a harbor or landing-place. Without spending more time upon these illustrations, I feel satisfied that the point insisted on, on behalf of the commissioners of highways, in this case, cannot be maintained. If it was ever supposed to be the law in England, it was on account of certain peculiarities which have only a limited application here. Nearly all the highways in England are such by prescription, dedication or user; and where a way is used by only a limited number of persons, the question will often arise whether it is a public highway or a private passage. This is a question to be determined by a jury; and the fact that the way is or is not a thoroughfare has a very strong bearing upon the issue. It was this which caused Mr. Justice CROMPTON to make the remark, that it was always a strong observation to the jury that the way leads nowhere.

None of the objections to this highway being, in my opinion, tenable, I am in favor of affirming the judgment appealed from.

WRIGHT, GOULD, ALLEN and SMITH, Js., concurred. DAVIES, J., concurred in so much of the preceding opinion as relates to the mill-yard. He dissented, however, as to the mill-race; holding that, if the public authorities could include it within a highway, they might also fill it up. He was also

of the opinion that a *cul de sac*, or road having no egress at one extremity, was not in contemplation in the enactment of our statutes regarding highways, though it may be established by dedication. SUTHERLAND, J., also dissented.

Judgment affirmed.